UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
MICHAEL SHUB,                           :
                                                    06 Civ. 8324 (WCC)
            Plaintiff,         :
                                                    **ECF CASE**

                                        :

        - against -                     :           **OPINION
                                                    AND ORDER**
WESTCHESTER COMMUNITY COLLEGE;          :
COUNTY OF WESTCHESTER; and
JOSEPH N. HANKIN, individually,         :

            Defendants.        :
- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                            LOVETT & GOULD
                            **Attorneys for Plaintiff**
                            222 Bloomingdale Rd., Suite 305
                            White Plains, New York 10605


KIM PATRICIA BERG, ESQ.

        Of Counsel




                            EPSTEIN, BECKER & GREEN, P.C.
                            **Attorneys for Defendants**
                            One Landmark Square
                            Stamford, Connecticut 06901


DAVID SETH POPPICK, ESQ.

        Of Counsel

                            **Copies E-mailed to Counsel of Record_____**

**Conner, Sr. D.J.:**

Plaintiff, Michael Shub, brings suit against Joseph N. Hankin, President of Westchester Community College ("WCC"), in his individual capacity, WCC and the County of Westchester (the "County"). Plaintiff, who was an Associate Professor of Mathematics at WCC until 1999, alleges he was denied a position as an Adjunct Professor for the Spring 2006 semester in retaliation for his protected First Amendment activities at WCC and due to his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.* He also alleges that he was denied an Adjunct position for the Fall 2006 semester and thereafter in retaliation for having filed a Charge of Discrimination under the ADEA with the Equal Employment Opportunity Commission ("EEOC").[1] Defendants now move for summary judgment. They argue that plaintiff did not engage in protected First Amendment activities, the reason he was not hired was not retaliatory, the person they hired was more qualified than plaintiff and plaintiff cannot establish that he was not hired because of his age. Defendants also argue that plaintiff cannot bring his retaliation claims under the ADEA because he did not file timely charges with the EEOC. For the following reasons, defendants' motion is granted in part and denied in part.

## BACKGROUND

The contentious history between these parties dates back many years and involves several prior litigations and arbitrations. Plaintiff was hired by WCC in 1970 and worked in the Mathematics Department as an Assistant and later Associate Professor. (Def. R. 56.1 Stmt. ¶¶ 1, 7.)

---

[1] Plaintiff also brought a claim against defendant Hankin under Section 296 of the New York State Executive Law. Plaintiff voluntarily dismissed this claim against Hankin on July 13, 2007 by Stipulation filed with this Court.

He left that position in August 1999; the parties contest whether he resigned or retired. Plaintiff states he retired pursuant to New York's Early Retirement Option. (Pl. R. 56.1 Stmt. ¶ 1.) Defendants state he resigned pursuant to a 1999 Settlement agreement between the parties. (Def. R. 56.1 Stmt. ¶ 1.) The events leading to the Settlement form the background for the contentious relationship.

## I.      Plaintiff's First Amendment Activities at WCC

Plaintiff was a member of the teacher's union and served on the executive board in the early 1970's at a time when, he claims, the union had "a very controversial and adversarial relationship with [Hankin]" and opposed his reappointment as President of WCC. (Pl. R. 56.1 Stmt. ¶¶ 60-61.) In the 1980's plaintiff was still an active member of the union and participated in several public demonstrations with respect to ongoing contract negotiations. (*Id*. ¶ 62.) These demonstrations were covered by the media. (*Id*.)

Plaintiff also served as Chair of the Academics Committee of the Faculty senate. (*Id*. ¶ 63.) In the mid to late 1970's the Committee recommended that no credit be offered for a mathematics open enrollment course, a position with which Hankin disagreed. (*Id*.) Hankin and plaintiff appeared before the WCC Board of Trustees to present their opposing viewpoints; plaintiff presented documentation to show the course was the equivalent of a junior high school class. (*Id*.) Plaintiff felt his relationship with Hankin "turned sour after that time." (*Id*.)

Plaintiff pursued an issue with Hankin in the early 1980's involving "inequitable treatment at WCC whereby members of the English Department received the benefit of a four-day schedule but other departments were denied the same benefit." (*Id*. ¶ 64.) Also during the 1980's plaintiff

was an "outspoken" member of a committee that investigated whether Hankin inappropriately used Faculty Student Association funds in a preferential manner for events that would benefit only select faculty members. (*Id*. ¶ 65.) Plaintiff claims Hankin was the "subject of extensive criticism in the Faculty Senate surrounding this highly publicized controversy." (*Id*. ¶ 66.) Plaintiff contends that after these activities he stopped receiving positive letters and other accolades from Hankin. (*Id*. ¶ 68.)

## II.    WCC Prefers Charges Against Plaintiff

In 1989 plaintiff was charged with conduct unbecoming a member of the staff based on allegations that he sexually harassed female students. (Def. R. 56.1 Stmt. ¶ 8.) Pursuant to the Collective Bargaining Agreement ("CBA") between the union and Westchester County, a neutral arbitrator was appointed and determined that plaintiff did act in a manner unbecoming a member of the faculty and should be suspended one semester without pay. (*Id*. ¶ 9; Poppick Decl., Ex. 5.) Plaintiff claims these charges were preferred in retaliation for his earlier First Amendment activities, and points out that the arbitrator felt that discharging plaintiff for his misconduct, as urged by Hankin, was excessive. (Pl. R. 56.1 Stmt. ¶¶ 8-9; Poppick Decl., Ex. 5.)

In July 1994 plaintiff was again charged with sexually harassing female students. (Def. R. 56.1 Stmt. ¶ 10.) He was suspended from classroom teaching pending the outcome of the charges and was reassigned to several curriculum projects with no reduction in basic salary. (*Id*.) During the course of the arbitration of these charges, plaintiff testified about Hankin's inappropriate use and written compilation of sexual jokes on or off campus. (Pl. R. 56.1 Stmt. ¶ 71.) Also, during the arbitration testimony plaintiff's lawyer asked Louis Rotando, Chairman of the Mathematics

Department, about his sale of textbooks for large sums of money.[2]  (*Id*. ¶ 72; Berg Aff., Ex. 1 at 132 & Ex. 3 at 184-85.)  Plaintiff states his relationship with Rotando changed after that and Rotando became "very cold" to him.  (Pl. R. 56.1 Stmt. ¶ 73.)

In November 1994 plaintiff commenced an action in this Court alleging that defendants violated his First and Fourteenth Amendment rights by denying him procedural due process when he was suspended as a result of the 1994 charges.  (Def. R. 56.1 Stmt. ¶ 11); *Shub v. Hankin*, 869 F. Supp. 213 (S.D.N.Y. 1994).  The court granted defendants' motion to dismiss, concluding that defendants did not violate procedural due process by acting pursuant to the CBA, notwithstanding plaintiff's claim of retaliation for exercising his rights of free speech and association.  *Shub*, 869 F. Supp. at 220.  The court additionally concluded that the impartiality of the arbitrator in the prior misconduct proceedings "remove[d] any taint from the fact that [] Hankin has previously charged [plaintiff] with sexual harassment."  *Id*.

### A.  The Settlement Agreement

The parties entered into a Settlement in 1999, in which WCC agreed to withdraw with prejudice the charges against plaintiff and expunge the charges from his file in exchange for plaintiff's resignation from WCC on or before August 31, 1999 and avoidance of contact with students between the date of the agreement and the resignation date.  (Def. R. 56.1 Stmt. ¶¶ 13-14;

---

[2]  Plaintiff states he raised a concern during this arbitration that Rotando inappropriately sold textbooks for large sums of money; he does not elaborate further on these allegations or whether there were any consequences or Rotando's reaction.  (Pl. R. 56.1 Stmt. ¶ 72.)  Defendants state that Rotando sold the books pursuant to an invitation to all faculty from the WCC bookstore director in 1993 to sell to the bookstore books for which they had no need.  (Poppick Reply Decl. ¶ 24, Ex. 22 at 162 & Ex. 28.)

Poppick Decl., Ex. 9.)  The Settlement also provided that if the State of New York offered an early retirement incentive in 1999 plaintiff could avail himself of the incentive at his discretion.  (Def. R. 56.1 Stmt. ¶ 14)  Pursuant to the Settlement plaintiff provided WCC with a general release and WCC paid plaintiff $75,000 in salary to which he was entitled.  (*Id*.)  In the general release, plaintiff released defendants from all actions, claims and demands that he "ever had, now [has] or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this release."  (Poppick Decl., Ex. 10.)

Plaintiff submitted to the County a written notice of intent to participate in the 1999 Early Retirement Incentive on August 9, 1999.  (Pl. R. 56.1 Stmt. ¶ 1; Berg Aff., Ex. 8).  Hankin sent plaintiff a letter on September 7, 1999 congratulating him on taking the Early Retirement, and again on October 19, 1999 notifying him that the Board of Trustees accepted his notice of retirement. (Berg Aff., Ex. 8)

### B.    Plaintiff's Return to WCC

At the time of the Settlement, plaintiff did not intend to return to WCC after August 31, 1999 because he had accepted a position to teach at Norwalk Community College for the Fall 1999 semester.  (Def. R. 56.1 Stmt. ¶ 15; Poppick Decl., Ex. 3, 59-60.).  He understood that Hankin did not want him on the WCC campus interacting with students.  (Def. R. 56.1 Stmt. ¶ 16.)  Hankin agreed to settle the second charges against plaintiff because he believed that in exchange plaintiff would never return to WCC to teach or interact with students.  (*Id*. ¶ 18; Hankin Decl. ¶ 9(f).)  This, however, was clearly not plaintiff's understanding.  Plaintiff thought he was not to come on campus and interact with students only during the time period specified in the Settlement, between July 23,

1999 and August 31, 1999.  (Pl. R. 56.1 Stmt. ¶ 16; Poppick Decl., Ex. 3 at 58-59.)

In fact, in November 1999, plaintiff applied to teach as an Adjunct at WCC for the Spring 2000 semester.  (Def. R. 56.1 Stmt. ¶ 19.)  Rotando received plaintiff's request and was unsure how to proceed because of the legal proceedings at the time; he testified that he may have sent copies to Mignogna, the academic dean and Hankin.  (Pl. R. 56.1 Stmt. ¶ 19; Berg Aff., Ex. 1 at 140-41.)[3] Hankin was not sure how he received plaintiff's request to teach but he imagines that whoever received the request passed it along to him because the settlement and the issue of sexual harassment on the campus was "fair knowledge."  (Berg Aff., Ex. 4 at 52-53, 59.)  He does not recall discussing plaintiff's request to teach or the prior sexual harassment allegations with Rotando or Raymond Mignogna, Associate Dean for the Division of Mathematics, but he probably discussed it with his cabinet and the county attorney's office.  (*Id*. at 56-57.)  Hankin replied to plaintiff's request by letter dated December 2, 1999 stating that his request could not be honored because his "retirement was a term of the settlement in an arbitration in which [he was] charged with 'Conduct Unbecoming A Member of the Staff.'" (Def. R. 56.1 Stmt. ¶ 19.)  The union thereafter filed a grievance on plaintiff's behalf in January 2000.  (*Id*. ¶ 20.)

While the grievance was pending, the County filed a proceeding in the Supreme Court of the State of New York, County of Westchester, seeking a declaration that the grievance was barred by the 1999 Settlement.  (*Id*. ¶ 21.)  The County's petition was denied by the court on May 31, 2000, and the judge determined that the Settlement did not explicitly preclude plaintiff from consideration

---

[3]  Rotando knew that plaintiff had filed a grievance against the college because plaintiff told him he was going to file it; plaintiff also may have mentioned to Rotando at the time that there was a sexual harassment suit against him. (Berg Aff., Ex. 1 at 128-32.)

for future employment at WCC. (*Id*.)[4]

In April 2002, an arbitrator sustained the union's grievance, determining that plaintiff qualified as a retiree under the CBA and, therefore, was entitled to be considered for a position and back pay for the semesters WCC declined to assign courses to him. (*Id*. ¶ 22.) As a result WCC paid plaintiff approximately $65,000 in back pay and assigned courses to him as an Adjunct beginning in the Fall 2002 semester. (*Id*. ¶ 23.) Because of plaintiff's retiree status he was put on a priority list to teach adjunct classes, pursuant to the CBA. (Pl. R. 56.1 Stmt. ¶ 23.)[5]

Plaintiff taught statistics as an Adjunct during the Fall 2003 semester and the Spring and Fall 2004 semesters. (*Id*.; Def. R. 56.1 Stmt. ¶ 23.) He did not teach for the Fall, Spring and Summer 2005 semesters. (Def. R. 56.1 Stmt. ¶ 23.)

## III.   WCC's Need for an Adjunct Professor in February 2006

During the early part of the Spring 2006 semester WCC was in need of an Adjunct to teach statistics because the professor teaching the class, Professor Mel Bienenfeld ("Bienenfeld"), took an unexpected leave of absence. (*Id*. ¶ 33.) On January 27, 2006, Sean Simpson ("Simpson"), Assistant Chair and Adjunct Coordinator for the WCC Mathematics Department, sent a memo, that

---

[4] The judge determined that, while it may have been the intention of the County and WCC that plaintiff not have contact with students at WCC ever again and was never to teach there again, the provisions of the agreement were "clear and unequivocal" and could not support that conclusion. (Poppick Decl., Ex. 12 at 3.) The judge also determined that plaintiff's departure from WCC was a retirement and not a resignation, pursuant to the terms of the agreement which provided for an early retirement incentive of which plaintiff availed himself. (*Id*. at 5.)

[5] The CBA § 3.9(f) provides: "The procedure for establishing the priority list of persons eligible for adjunct employment shall be as follows: 1. In terms of seniority . . . c. All retired faculty . . . with 10 years of full time teaching or service." (Poppick Decl., Ex. 16.)

plaintiff received, stating that immediate coverage was needed for two statistics classes and one algebra class for the remainder of the semester. (*Id*. ¶ 34.) The memo explained that courses would be assigned according to priority under the CBA and qualifications to teach the course. (*Id*.)

### A.    The Applicants

Plaintiff, Peter Mucci ("Mucci") and one other person, applied to teach the two statistics classes. (*Id*. ¶ 39.) At this time Mucci was thirty-seven years old and plaintiff was sixty-two years old. (Pl. R. 56.1 Stmt. ¶¶ 165-66.) Mucci was already teaching a section of the same statistics course that semester, having applied to teach as an Adjunct for the prior semester. (Def. R. 56.1 Stmt. ¶¶ 24, 39.) Mucci earned a Bachelor of Science degree, *summa cum laude*, in mechanical engineering from the State University of New York at Buffalo and a Master of Science degree in mechanical engineering from Ohio State University, where he was a teaching/research assistant and taught undergraduate courses that had mathematical content. (*Id*. ¶ 25.) His undergraduate and graduate school curriculums included several mathematics courses. (*Id*.) Mucci also took graduate level courses in mathematics and pedagogy at City University of New York during 2002 and 2003, including a statistics course in which he received an "A" grade. (*Id*. ¶ 26.) He taught high school courses in New York City in algebra, geometry, probability and trigonometry from 2002 to 2004. (*Id*. ¶ 27.) He was employed by The Trane Company from 1994 to 1999 and General Electric Company ("GE") from 1999 to 2001 as a mechanical engineer; at GE he had training in statistical methodology and used math in his employment. (*Id*. ¶ 28.)

Plaintiff earned a Bachelor of Science and a Master of Arts in Mathematics from New York University. (Pl. R. 56.1 Stmt. ¶ 144.) Plaintiff took more courses in mathematics than Mucci. (*Id*.

¶¶ 145-46.)[6]  Plaintiff was also certified to teach mathematics at the high school level.  (*Id*. ¶ 147.)

All in all, plaintiff had approximately thirty years of full-time teaching experience plus four years

of adjunct teaching experience.  (*Id*. ¶ 152.)

Mucci interviewed for a position to teach at WCC with Joyce McQuade ("McQuade"), the

Adjunct Coordinator at the time, during the summer of 2005.  (Def. R. 56.1 Stmt. ¶ 29;  McQuade

Decl. ¶ 2;  Mucci Decl. ¶ 6.)  He provided her with a copy of his resume, his transcripts and the

application and background data check forms.  (McQuade Decl. ¶ 2; Mucci Decl. ¶ 6.)  Mucci was

hired as an Adjunct in the Mathematics Department for the Fall 2005 semester.  (Def. R. 56.1 Stmt.

¶ 29.)  During the Fall 2005 semester McQuade told Rotando that Mucci had the qualifications to

teach statistics, she thought highly of him and he should be considered for teaching that course.  (*Id*.

¶ 30; McQuade Decl. ¶ 4; Rotando Decl. ¶ 2.)  Rotando reviewed Mucci's resume and transcripts,

spoke with Mucci about the work he did for GE that involved statistics and was impressed with him.

(Def. R. 56.1 Stmt. ¶ 31; Rotando Decl. ¶ 3; Poppick Reply Decl. ¶ 6.)[7]  Mucci was re-hired to teach

for the Spring 2006 semester and was assigned the statistics course before anyone knew there would

be a need for additional coverage for other sections due to a professor's emergency leave of absence.

(Def. R. 56.1 Stmt. ¶ 32; Poppick Reply Decl. ¶ 5.)

---

[6]  Plaintiff had 42 credits at the undergraduate level compared to Mucci's 26, and 36 at the graduate level compared to Mucci's 9.  The number of credits are the numbers plaintiff submitted in his Rule 56.1 Statement.  However, in examining Mucci's transcripts the court finds he has 15 graduate credits in math; specifically the classes include "Tch Corctv Sec Math" (3), "Tchg Math Sec Sch" (3), "Mathematical Stats" (3), "Enrich Tch Sec Math" (3), and "Prb Solv Strat Math" (3). (Berg Aff., Ex. 13.)  Mucci took numerous engineering courses for both his degrees in mechanical engineering which had mathematical content as well.

[7]  Mucci testified that he remembered this conversation with Rotando.  (Poppick Reply Decl., Ex. 24 at 41.)

Plaintiff believed that he was entitled to priority for the position under the CBA as a "retiree," even though he did not teach for three consecutive semesters during 2005. (Def. R. 56.1 Stmt. ¶ 41.) In addition to the clause regarding the priority list for Adjuncts, section 3.9(f)(3) of the CBA provides that "[t]hose adjunct faculty who choose not to teach at all for three consecutive semesters (including summer) will be removed from the priority list." (Poppick Decl., Ex. 16.) Plaintiff, however, believed that retirees were in a different category. (Def. R. 56.1 Stmt. ¶ 41.)

## B.    Defendants' Decision

After Simpson heard from plaintiff, Mucci and the other applicant, he told Rotando and Mignogna the names of the interested candidates. (Simpson Decl. ¶ 3.) Mignogna asked Simpson if plaintiff had taught in the last three semesters. (Berg Aff., Ex. 6 at 52-53.) During a second conversation Simpson told Mignogna that plaintiff had not taught in the last three semesters and Mignogna then told Simpson that plaintiff was therefore not on the priority list. (*Id*.) Simpson told Mignogna that he preferred Mucci because Mucci was already teaching a section of the same course. (*Id*.; Simpson Decl. ¶ 4.)

Rotando and Mignogna thought that since plaintiff had not taught for three consecutive semesters in 2005 he was not automatically entitled to teach the courses based on priority. (Def. R. 56.1 Stmt. ¶ 42; Mignogna Decl. ¶ 3; Rotando Decl. ¶¶ 5-6.)[8] To confirm this, Mignogna asked Marjorie Glusker, Vice President and Dean of Continuing Education, whether an Adjunct who had not taught for three consecutive semesters was on the priority list. (Def. R. 56.1 Stmt. ¶ 43;

---

[8] This did not mean, however, that he was precluded from the position, just that he was not automatically entitled to it. (Pl. R. 56.1 Stmt. ¶ 40.)

Mignogna Decl. ¶ 5; Glusker Decl. ¶ 2.)[9]  He also wanted to check whether or not the county executive orders regarding background checks would impact the college's hiring decision. (Berg Aff., Ex. 2 at 33.)[10]  Glusker asked WCC labor relations specialist Michael Wittenberg the question Mignogna posed to her about the priority list and Wittenberg responded that the Adjunct was eligible to teach but was not on the priority list.  (Def. R. 56.1 Stmt. ¶ 44; Glusker Decl. ¶ 3; Wittenberg Decl. ¶¶ 2-3.)  Glusker conveyed this to Mignogna who conveyed the information to Rotando.  (Def. R. 56.1 Stmt. ¶ 44; Glusker Decl. ¶ 3; Mignogna Decl. ¶¶ 6-7; Rotando Decl. ¶ 6.)  Rotando told Mignogna he wanted to hire Mucci and Mignogna said he could hire whomever he preferred. (Mignogna Decl. ¶ 7; Rotando Decl. ¶ 6.)[11]  Simpson was told by Rotando or Mignogna to tell Mucci he was selected to teach the statistics classes and to tell plaintiff that he was not.  (Simpson Decl. ¶ 5.)  Mucci was then hired to teach the two statistics classes.  (Def. R. 56.1 Stmt. ¶ 45.)

Rotando states that he hired Mucci because Mucci was already teaching a section of the same statistics course, graduated *summa cum laude*, received an "A" in a graduate statistics course, taught

---

[9] Plaintiff denies this, claiming that Mignogna testified at his deposition that he mentioned plaintiff to Glusker but that Glusker claimed she did not recall plaintiff being mentioned.  (Pl. R. 56.1 Stmt. ¶ 43.)  However, there is no contradiction in Mignogna's and Glusker's testimony. Mignogna stated he mentioned plaintiff but Glusker testified that she did not recall that; she did not deny it.  It is understandable that she would not recall plaintiff's name because she also testified that she did not know plaintiff when he taught at WCC.  (Poppick Reply Decl. ¶ 14.)

[10] At this time, Mignogna was aware generally that plaintiff had been involved in various arbitrations and litigation with the college and Hankin but he did not know specifics.  (Berg Aff., Ex. 2 at 33.)  He did not know that Hankin and the college wanted a complete separation from plaintiff. (*Id*. at 34.)

[11] Plaintiff points out that at Mignogna's deposition, Mignogna could not remember who told him he wanted to hire Mucci, Rotando or Simpson, but that the determination was made between Rotando and Simpson subject to Mignogna's approval, and when Mignogna heard they wanted to hire Mucci, Mignogna agreed.  (Berg Aff., Ex 2 at 57.)

undergraduate engineering courses with mathematical content, had training in statistics at GE and received a favorable recommendation from McQuade. (Def. R. 56.1 Stmt. ¶ 46; Rotando Decl. ¶¶ 3, 5, 8.) Additionally, although Mucci did not have a mathematics degree, his undergraduate and graduate course-work included courses in mathematics and applied mathematics. (Poppick Reply Decl., Ex. 22 at 166.) Hankin was not consulted nor did he participate in the decision made in February 2006 to hire Mucci instead of plaintiff. (Def. R. 56.1 Stmt. ¶ 48; Hankin Decl. ¶¶ 3, 7; Mignogna Decl. ¶ 10; Rotando Decl. ¶ 6.) Rotando and Mignogna did discuss whether to hire Mucci or plaintiff. Rotando told Mignogna that since they were not obligated to hire plaintiff because he was no longer on the priority list, he thought Mucci was the better choice and Mignogna agreed because Mucci was currently teaching the course and had an outstanding record and Mucci would not need a background check as plaintiff would, and they needed coverage for the class quickly. (Berg Aff., Ex. 2 at 55-56.)[12]

At his deposition, Rotando stated he did not compare plaintiff and Mucci directly, and he had not seen plaintiff's academic record in years. (Pl. R. 56.1 Stmt. ¶ 25; Berg Aff., Ex. 1 at 153.) He knew, however, that plaintiff had taught this statistics course previously for many years. (Pl. R. 56.1 Stmt. ¶ 151; Berg Aff., Ex. 1 at 71.) He testified that he compared Mucci and plaintiff in a general way because he recalled plaintiff's graduate work and compared it to Mucci's recent graduate

---

[12] The background check was required for all new hires and plaintiff would have needed one. Mignogna stated that he thought the process took several weeks and therefore plaintiff would not be cleared in time. (Mignogna Decl. ¶ 11.) According to a 2005 email from the Director of Human Resources, sent to Hankin, Glusker and Mignogna among others, the results of the background checks should be available within 72 hours of the fingerprinting date. (Berg Aff., Ex. 16.) Glusker testified that she could grant an emergency waiver for the background check if the hiring administrator could not "get anybody else to do [the] job who has already been through the process." (Berg Aff., Ex. 5 at 31.)

courses and Mucci's industrial statistical experience; he felt Mucci was "a good person to try." (Poppick Reply Decl., Ex. 22 at 152.)  Mignogna testified that  he had never reviewed plaintiff's resume, however he did not question plaintiff's qualifications.  (Pl. R. 56.1 Stmt. ¶ 25; Berg Aff., Ex. 2 at 88-89.)  Simpson testified that he did not know anything about plaintiff's background in terms of his education or experience.  (Pl. R. 56.1 Stmt. ¶ 25; Berg Aff., Ex. 6 at 37.)  He also stated that when considering an applicant for an adjunct position the first thing he considers is the applicant's math degree or background.  (Pl. R. 56.1 Stmt. ¶ 148.)


### C.    Defendants Inform Plaintiff of Their Decision

On February 7, 2006 Plaintiff received a message from Simpson that he was not hired because the college hired someone else who was on the priority list.  (Pl. R. 56.1 Stmt. ¶ 115.)[13] Plaintiff states that when he spoke with Rotando about the decision on February 10, 2006, Rotando told him that he was removed from the priortity list and that decision was made higher up and he should speak with Mignogna.  (*Id.* ¶ 45; Berg Aff., Ex. 1 at 107 & Ex. 3 at 105.)[14]  Mignogna left plaintiff a message on February 11, 2006 stating that whether Mucci had taught the class before was "irrelevant" because the issue was the priority list and the background check.  (Pl. R. 56.1 Stmt. ¶ 30; Berg Aff., Ex. 3 at 104-05.)  He also said that plaintiff was not on the priority list and that plaintiff could argue the point with the people above him but those were the instructions he got.

---

[13]  However, Mucci was not on the priority list.  (Berg Aff., Ex. 2 at 52.)

[14]  At Rotando's deposition he did not recall saying anything to plaintiff other than plaintiff was not on the priority list and they weren't hiring him.  (Berg Aff., Ex. 1 at 107.)

(Berg Aff., Ex. 15.)[15]  Plaintiff had an in-person meeting to discuss the hiring decision with Mignogna on February 15, 2006, and Mignogna told him that the decision "was made at the highest level of the college administration."  (*Id.*, Ex. 2 at 114-16.)  Mignogna later explained that by this comment he meant that he was following the background check directive and the only person he was referring to as higher up in the administration was his superior, Glusker.  (*Id.*)[16]  In plaintiff's recounting of the conversation he stated that Mignogna told him he was removed from the priority list and that decision came from higher up; he also told plaintiff there was no check of his qualifications and that Mucci was hired because he did not need to go through a background check but plaintiff did.  (*Id.*, Ex. 3 at 107, 109 & Ex. 11.)  At Mignogna's deposition he said it was his view that plaintiff did not get the position because he would have had to go through a background check, based on the instructions he received from higher up regarding the background check directive.  (Pl. R. 56.1 Stmt. ¶ 129; Berg Aff., Ex. 2 at 114-15.)[17]

---

[15]  At Mignogna's deposition, Mignogna clarified that he meant plaintiff could argue the point about whether he was still on the priority list with Glusker because Glusker agreed with Mignogna about the interpretation of the contract.  (Berg Aff., Ex. 2 at 105-06.)

[16]  At Mignogna's deposition he did not recall using the words "at the highest level of the college administration."  (Berg Aff., Ex. 2 at 114.)  He did confirm that plaintiff sent him a letter memorializing their conversation shortly after it happened, this phrase appeared in that letter and at the time he received that letter it "seemed a reasonable description of what [they] had talked about." (*Id.* at 110-11 & Ex. 11.)  Plaintiff points out that the highest level of administration is Hankin, as Mignogna acknowledged at his deposition.  (Pl. R. 56.1 Stmt. ¶ 45; Berg Aff., Ex. 2 at 116-17.)

[17]  In his Declaration, Mignogna states that Rotando never gave this as a reason why he preferred Mucci to plaintiff; the reason occurred to Mignogna and that is why he shared it with plaintiff.  (Mignogna Decl. ¶ 11.)

14

## IV. Events After the Spring 2006 Semester

Mucci taught the statistics courses in the Spring of 2006 but neither he nor plaintiff sought a teaching assignment for the Summer 2006. (Def. R. 56.1 Stmt. ¶ 49.) The professor who left in the Spring returned to teach the statistics course during the Fall 2006. (*Id.*) Plaintiff applied to teach as an Adjunct for the Fall 2006 and Spring, Summer and Fall 2007 semesters. (Pl. R. 56.1 Stmt. ¶¶ 161-62.) Plaintiff was not hired to teach any courses in the Fall 2006 or in any subsequent semester. (*Id.* ¶ 163.) Rotando testified that it was his decision not to hire plaintiff for these semesters and he made that determination because there was a "suit pending against [WCC] and [he] just didn't know how to proceed after that." (Berg Aff., Ex. 1 at 116.) Mignogna also testified that he saw plaintiff's requests to teach and instructed Simpson not to respond because he was unsure of the status of the grievance and the lawsuit and he knew there was "another action of some sort." (*Id.*, Ex. 2 at 131-32.) Plaintiff had since filed EEOC charges and this action. Hankin also saw the letters plaintiff submitted requesting a position for Fall 2006 and 2007; he is not sure who passed them on to him, and he did not discuss them with anyone or indicate how anyone should respond to them. (*Id.*, Ex. 4 at 28-30.)

The union commenced a grievance on plaintiff's behalf against WCC in March 2006 as a result of the decision to hire Mucci instead of him. (Def. R. 56.1 Stmt. ¶ 50.) The grievance sought to resolve whether plaintiff was entitled to priority as a retiree or whether, pursuant to CBA § 3.9(f)(3), he was no longer on the priority list because he had not taught for three consecutive semesters. (*Id.*)

When Hankin was informed of the grievance by the union he emailed Mignogna and asked if there was precedent for the decision not to hire an adjunct who had not taught for three consecutive

semesters. (Mignogna Decl. ¶ 10.) Mignogna provided two examples where the same decision was made in the past within the Mathematics department. (*Id.*; Berg Aff., Ex. 25.) Those two individuals were also retirees; one was in his sixties and the other "may have been as old as 70." (Pl. R. 56.1 Stmt. ¶ 168; Berg Aff., Ex. 4 at 38.) When one of these individuals applied to teach after missing three semesters in a row, Rotando followed the same procedure he did with plaintiff: he spoke with Mignogna, who told him the professor was not on the priority list and Rotando was under no obligation to rehire him. (Pl. R. 56.1 Stmt. ¶ 169; Berg Aff., Ex. 1 at 44.)

Plaintiff filed a claim of age discrimination against WCC with the EEOC in June 2006, and requested a right to sue letter from the EEOC in July 2006. (Def. R. 56.1 Stmt. ¶ 51.) In June 2006 plaintiff commenced a proceeding in the Supreme Court of the State of New York, County of Westchester, seeking to nullify the decision by WCC to deny plaintiff's application to teach in February 2006. (*Id.* ¶ 52.) This proceeding was dismissed by an Order dated September 20, 2006 because plaintiff failed to exhaust his administrative remedies under the CBA, since the union's grievance was still pending. (*Id.*) [18] Plaintiff filed an appeal of that Order, which is pending. (*Id.*)

Plaintiff commenced this action on October 12, 2006. (*Id.* ¶ 53.) Plaintiff alleges that

---

[18] Since the filing of this motion, WCC and the union stipulated on September 20, 2007 that adjunct faculty, which includes retirees, shall be removed from the priority list if they do not teach three consecutive semesters. (Wittenberg Decl. Sept. 20, 2007, Ex. A.)

Defendants argue in their Motion papers that plaintiff is attempting to litigate what is essentially "a contract dispute in the guise of a civil rights suit" because plaintiff's claim arises from the disputed interpretation of the CBA. (Def. Mem. Supp. Summ. J. at 14.) If it were the case that removal from the priority list precluded plaintiff from teaching then this would certainly be a matter of contract interpretation. However, removal from the list just meant that plaintiff did not have priority; he could still be considered for the Adjunct position. Therefore, the issue here is whether defendants' decision to hire Mucci over plaintiff violated plaintiff's civil rights, not whether plaintiff was incorrectly removed from the priority list in violation of the CBA. This is a civil rights claim.

Hankin denied his application for an Adjunct position in February 2006 in retaliation for plaintiff having filed the previous civil rights action, for having exposed Hankin's gender discriminatory conduct on campus and for having expressed his opinion that Hankin had misappropriated funds. (Complt. ¶ 22.) He also alleges that he was discriminated against by reason of his age because Mucci was younger, less experienced and less qualified. (*Id*. ¶¶ 23, 25.) Finally, he alleges that Hankin rejected his application to teach as an Adjunct during the Fall 2006 semester in retaliation for plaintiff having filed the age discrimination charges with the EEOC. (*Id*. ¶ 24.)

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. *See* FED. R. CIV. P 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether to grant summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

Applying the summary judgment standard in an employment discrimination case can be difficult because such cases "necessarily turn on the intent of the alleged discriminator, and plaintiffs will rarely uncover direct evidence of discriminatory intent." *O'Sullivan v. N.Y. Times*, 37 F. Supp. 2d 307, 314 (S.D.N.Y. 1999). Nevertheless, to survive summary judgment an employment discrimination plaintiff must present more than "conclusory allegations of discrimination; . . . he must offer concrete particulars to substantiate [his] claim." *Id.* (internal quotation marks and

citations omitted; brackets in original). In other words, the plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason'" for the employment action. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (quoting *Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir. 1994)) (internal brackets omitted). The plaintiff must show a genuine issue of material fact as to both the veracity of defendants' stated reasons for promoting another person over the plaintiff, and whether it is more likely that a discriminatory motive played a role in that decision. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1225 (2d Cir. 1994).

## II.    Plaintiff's First Amendment Retaliation Claim

### A.    Plaintiff's First Amendment Claim is Not Barred by the Settlement Release or the Statute of Limitations

Defendants argue that all claims based on events that occurred before August 2, 1999 are precluded by the 1999 release plaintiff signed in connection with the Settlement. (Def. Mem. Supp. Summ. J. at 15.) Plaintiff counters that the release only bars him from recovering damages for acts prior to the date of the release, July 23, 1999, and that the events upon which the current suit is based all occurred since February 2006 (when the decision was made not to hire him). (Pl. Mem. Opp. Summ. J. at 26.)

"A general release is a release that covers 'all claims and demands due at the time of its execution.'" *Melwani v. Jain*, 2004 WL 936814, at *6 (S.D.N.Y. Apr. 29, 2004) (quoting *Kaul v. Hanover Direct, Inc.*, 296 F. Supp. 2d 507, 517 (S.D.N.Y. 2004)); *see Cont'l Cas. Co. v. Tillotson*,

1984 WL 676, at *2-3 (S.D.N.Y. Aug. 3, 1984).  Here, plaintiff provided defendants with a release of all claims that he "ever had, now [has] or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this release."  This is the very definition of a general release.  The release is also referred to as a "general release" by the parties in the 1999 Settlement.  (Poppick Decl, Ex. 9 ¶ 4.)  Therefore, plaintiff is barred from bringing claims against defendants based on defendants' actions prior to the signing of the release in July 1999.  If defendants had denied plaintiff a position at WCC prior to the date of the release and plaintiff's an action were based on that denial, it would be barred by the release.  Plaintiff's current claims, however, are based on defendants' actions in February 2006 and thereafter.  Plaintiff did not release defendants from liability for actions they would take after the date of the signing of the release.  Although plaintiff relies on events prior to 1999 to establish a background for defendants' retaliatory intentions and conduct, the general release does not prohibit him from doing such.  Therefore, this action is not barred by the release.

Defendants next argue that the statute of limitations period for First Amendment claims is three years, and therefore since plaintiff commenced the action in October 2006 all claims based on events prior to October 2003 are time-barred.  (Def. Mem. Supp. Summ. J. at 15.)  They argue that the only event at issue after October 2003 was Rotando's decision in February 2006 not to hire plaintiff, and there is no evidence that Rotando's decision implicated a violation of plaintiff's First Amendment rights and Hankin did not play a role in the decision at all.  (*Id*. at 15-16.)  Plaintiff argues that he is not precluded from relying on events prior to the three-year statute of limitations period to establish background evidence of defendants' unlawful motives and intent. (Pl. Mem. Opp. Summ. J. at 26.)

The parties do not dispute that the claim is governed by a three-year statute of limitations. *See Malley v. Fernandez*, 1992 WL 204359, at *3 (S.D.N.Y. Aug. 10, 1992). Under federal law the claim accrues once the plaintiff knows or has reason to know of the injury that forms the basis of the action. *Donovan v. Inc. Vill. of Malverne*, 2008 WL 479994, at *5 (E.D.N.Y. Feb. 19, 2008). In this action the injuries for which plaintiff seeks relief occurred in February 2006 and after. This claim was brought within three years of February 2006. The statute of limitations does not bar plaintiff from relying on events prior to February 2006 to establish defendants' retaliatory intent. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) (determining that relevant background evidence, such as statements by the person who made earlier decisions typifying the retaliation involved, may be considered to assess liability for the timely alleged act). Defendants argue that reliance on *Jute* is inapposite because it did not involve a release of claims like the one signed by plaintiff. (Def. Reply Mem. Supp. Summ. J. at 4.) However, as already discussed, the release does not preclude plaintiff's reliance on events prior to July 1999 as background evidence of retaliatory motive for defendants' actions since July 1999; it simply released defendants of liability for claims arising from the events up to July 1999. Therefore, plaintiff's First Amendment claim is timely.

### B. Plaintiff Does Not Satisfy the Elements of a First Amendment Claim

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). To establish a violation of those rights, a government-employee plaintiff "must initially demonstrate by a preponderance of the

evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him." *Hale v. Mann*, 219 F.3d 61, 70 (2d Cir. 2000) (internal quotation marks and citation omitted). To establish a causal connection, a plaintiff must demonstrate that the speech was a substantial or motivating factor for the adverse employment action. *See Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313 (2d Cir. 2005) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).

### 1.      Constitutionally Protected Speech

Defendants argue that plaintiff's speech is not constitutionally protected because it does not touch on matters of public concern and was not motivated by a desire to further or protect the public interest. (Def. Mem. Supp. Summ. J. at 19.) Specifically, they argue that plaintiff's speech concerned "job-related events, his dissatisfaction with internal employment decisions concerning him, personal conflicts with Hankin and [plaintiff's] personal motivation and interest in being re-hired as an Adjunct." (*Id.*) Plaintiff argues that the matters he spoke about "touched upon matters of manifest public concern" and he was "associated with and served in a leadership position of his union." (Pl. Mem. Opp. Summ. J at 9.) Specifically, he served as an active member of the teacher's union, participated in demonstrations that were the subject of publicity in the media, served as Chair of the Academics Committee when the Committee was investigating whether low-level open enrollment courses should be given for credit, pursued an issue involving inequitable treatment of faculty at WCC, was an outspoken member of a committee which investigated Hankin's alleged inappropriate use of funds from the Faculty Student Association and testified at his disciplinary

hearing about Hankin's inappropriate use and written compilation of sexual jokes on and off campus. (*Id*. at 7-9.)

"[A] federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior . . . when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Connick*, 461 U.S. at 147-48 (determining plaintiff's questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns were not questions of public import nor did they seek to bring to light breach of public trust). "The Court determines as a matter of law whether the speech at issue touches a matter of public concern by examining its 'content, form, and context . . . as revealed by the whole record.'" *Harris v. Merwin*, 901 F. Supp. 509, 512 (N.D.N.Y. 1995) (quoting *Connick*, 461 U.S. at 147-48 & n.7) (alterations in orignal); *see Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002). Personal concerns do not become matters of public interest simply because they are publicized in the media. *See Luck v. Mazzone*, 52 F.3d 475, 477 (2d Cir. 1995) (finding employees complaint about lack of air conditioning at her place of employment was essentially a private complaint despite fact that complaint was aired as a news item on a radio station); *Harris*, 901 F. Supp. at 514 (concluding that local press's decision to publish an article about the issue on which plaintiff spoke does not demonstrate that his speech touched upon matters of public concern).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate

their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006) (determining plaintiff "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case"; rather he "performed the tasks he was paid to perform"). In *Harris*, a professor spoke out about the appointment of an individual without "academic rank" to the chairmanship of his department. 901 F. Supp. at 511. The court held that the speech concerned a "personal grievance by a disgruntled public employee that Second Circuit courts have refused to characterize as speech protected by the First Amendment." *Id*. at 513. The court went on to state that plaintiff did not allege, and there was no evidence to suggest, that he spoke out about any wrongdoing, fraud, or abuse on the part of college that the general community would consider important. *Id*.

Plaintiff cites *Rao v. New York City Health and Hospital Corp.*, 905 F. Supp. 1236 (S.D.N.Y. 1995), and *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41 (2d Cir. 1983), in support of his assertion that his speech touched matters of public concern. In *Rao*, the plaintiff spoke out about deficiencies in a contractor's performance on an important public project for his employer and alleged extortion attempts by a community group the employer used. 905 F. Supp. at 1243. The court determined the plaintiff's primary intent in writing and making verbal complaints was not to further his own professional development, but to make his superiors aware of problems in the management of a major city project and of perceived extortion attempts. *Id*. Therefore, his speech was protected. *Id*. In *Rookard*, plaintiff brought to her superiors' attention corrupt and wasteful practices at the municipal hospital where she was employed, including: the use of unlicensed nurses employed by outside commercial agencies in violation of state rules and regulations; abuse of the hospital's sign-in procedures; the failure to keep records for agency nurses and therefore the

inaccuracy of bills submitted by agencies; the overpayment of nurses who worked overlapping, consecutive shifts; the use of a single agency for hiring nurses; the lack of proper credentials for agency nurses and improper documentation of the immigration status of some of the nurses. 710 F.2d at 43-44. The court determined that "[a]n allegation of corrupt and wasteful practices at a large municipal hospital, made to the city official empowered to investigate such charges, obviously involves a matter of public concern." *Id*. at 46.

On the record before us, plaintiff's speech consisted of job-related opinions and ideas that did not implicate matters of public concern. Like the plaintiff in *Garcetti*, plaintiff was speaking pursuant to his employment responsibilities as Chair of the Academics Committee when he challenged Hankin on the issue of course credits.[19] When plaintiff pursued issues involving inequitable treatment of faculty[20] or preferential use of funds for faculty and inappropriate sexual jokes by the college President, he was speaking as an employee at WCC concerned about internal affairs at the college. Plaintiff offers no evidence that these were matters of public concern or that plaintiff was driven by a desire to protect the public. He does not provide evidence that the inequitable treatment of faculty had any impact beyond the faculty members involved, and the inequitable treatment concerned merely the fact that some faculty were not required to teach night courses while others were. These types of scheduling issues are internal employment concerns and do not affect or concern the public. Additionally, plaintiff does not allege that Hankin misappropriated or misused public funds. At the time Hankin was investigated for misappropriating

---

[19] Plaintiff did not support the decision to give college credit for a math course that he felt was essentially a "sixth grade mathematics" course. (Berg Aff., Ex. 3 at 68-69.)

[20] Plaintiff requested that the math department get the same "privileges as the English department." (Berg Aff., Ex. 3 at 70-71.)

funds, the funds were those of the Faculty Student Association and Hankin allegedly used them in a preferential manner among the faculty. Plaintiff offers no evidence why this was a matter that would concern the public or why the pursuit of the investigation was motivated by a desire to protect the public or public funding. Plaintiff simply disagrees with the way in which Hankin chose to allocate WCC's limited resources. Merely because a school is funded by public money does not make every issue at that school a matter for public concern. *See Connick*, 461 U.S. 149. Finally, allegations of sexual harassment or discrimination by the administration at WCC may well be matters of public concern. However, based on the content, form, and context of plaintiff's speech concerning Hankin's inappropriate use of sexual jokes, plaintiff's speech was not a matter of public concern. Plaintiff addressed the issue during his testimony at the arbitration for his alleged sexual harassment of students; he offers no evidence that he pursued the issue in any manner beyond that in an attempt to protect the college or the public.[21] Nor does he offer any evidence as to how or why the jokes would constitute harassment or discrimination in the administration of the college. For these reasons, this speech is not protected.

### 2.     <u>Union Activities</u>

We now consider whether plaintiff's union activities are protected. Retaliation against public employees solely for their union activities violates the First Amendment. *See Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir. 1999); *see also Scott v. Goodman*, 961 F. Supp. 424, 435 (E.D.N.Y. 1997). The Second Circuit has said that even activities related to intra-union disputes can involve a matter of

---

[21] Examining the context of plaintiff's statements, plaintiff made the accusations in a private forum, which was dealing with an unrelated issue. This undermines any claim that he was motivated by a desire to protect the public.

public concern. *Clue*, 179 F.3d at 61. Because plaintiff was an active member of the union, his union activities during the 1970's and 1980's are protected by the First Amendment.[22] We must therefore determine whether there is a causal connection between these protected activities and the adverse employment action; for there is no dispute that plaintiff suffered an adverse employment action when WCC did not hire him. *See Morris*, 196 F.3d at 110 ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.").

### 3. <u>Causal Connection Between Speech and Adverse Employment Action</u>

"In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks and citation omitted; alteration in original). There is no bright line beyond which a temporal relationship is too attenuated to establish a retaliatory motive for adverse employment action, however this Circuit has found that even a year is too long. *See Burkybile*, 411 F.3d at 314 (determining plaintiff failed to establish third element of causal nexus because more than a year passed between the protected activity and the adverse employment action); *Deravin v. Kerik*, 2007 WL 1029895, at *11 (S.D.N.Y. Apr. 2, 2007) (concluding that period of about three years between the protected activity and the first adverse action was "too long to constitute the type of 'very close' temporal proximity that can indirectly show the causal connection required to establish a prima facie case of retaliation"). Surely

---

[22] Plaintiff states he was an active member of the union in the 1970's and 1980's, he does not identify the specific years. (Pl. R. 56.1 Stmt. ¶¶ 60, 62; Berg Aff., Ex. 3 at 116-17.)

then a gap of approximately twenty years is too attenuated to establish by itself a causal connection between plaintiff's protected union activities in the 1980's and the decision in 2006 not to hire him.

But the absence of close temporal proximity of the protected activity to the adverse action is not necessarily fatal, because evidence of an ongoing pattern of retaliatory conduct and intent can also establish a causal connection. For example, in *Gagliardi v. Village of Pawling*, the plaintiffs complained to the Village in 1981 about Zoning Code violations by a non-party. 18 F.3d 188, 190 (2d Cir. 1994). The Village continually failed to enforce the Code against this non-party despite the plaintiffs' complaints, failed in 1985 to enforce other ordinances as to this non-party and took further actions adverse to the plaintiffs in 1990. *Id*. at 195. The court determined that the "detailed allegations provide[d] a chronology of events from which an inference can be drawn that actions taken by the [defendants] were motivated by or substantially caused by the [plaintiffs'] exercise of their First Amendment rights." *Id*. In *Housing Works, Inc. v. City of New York*, the court found that the defendants' knowledge of the plaintiff's demonstrations criticizing the Mayor's administration and their lawsuits against the City and various officials over the previous five years, including the lawsuit that occurred the year before the adverse action in which the State Commissioner of Labor withdrew plaintiff's labor certification, "was temporally proximate to that decision, even if that knowledge accrued incrementally, as each event occurred." 72 F. Supp. 2d 402, 423 (S.D.N.Y. 1999). The court concluded that this proximity in time between the plaintiff's protected speech and the defendants' conduct constituted indirect evidence of an improper motive. *Id*. at 424.

Here, plaintiff argues that although his protected activities primarily occurred in the 1970's and 1980's, "the ongoing pattern of Hankin taking action to get rid of [p]laintiff since that time, together with the numerous legal actions that resulted therefrom, is sufficient to satisfy the causation

requirement." (Pl. Mem. Opp. Summ. J. at 12.) He argues that Hankin's first retaliatory action was the sexual harassment charges preferred against plaintiff in 1989. (*Id*. at 14.) Plaintiff contends that Hankin sought his termination but did not succeed in that he was merely suspended for one semester because the arbitrator found termination would be an excessive punishment. (*Id.*) Plaintiff argues that Hankin next took retaliatory action when he filed the second set of disciplinary charges in 1994. (*Id*.) He contends that Hankin failed to "get rid" of him because the result of those charges was the 1999 Settlement. (*Id*.) Plaintiff continues that the next retaliatory action was when Hankin rejected his applications to teach as an Adjunct from 2000 to 2002. (*Id*.) Plaintiff asserts that the next opportunity Hankin had to retaliate was when he applied again to teach in February 2006. (*Id*. at 15.)

Plaintiff's union activities occurred in the 1970's and 1980's and the first action he alleges was motivated by retaliation for those activities was the sexual harassment charges in 1989. Even if we assume proximity, the charges are not, as a matter of law, retaliation. Plaintiff has not provided any evidence that the charges were motivated by a desire to retaliate against him for his union activities. Hankin received complaints of sexual harassment and pursued the matter, as was his job.[23] The allegations included complaints that plaintiff: chased a former student in his car; created a petition, for personal reasons, that he claimed was signed by his students; invited a female student to an off-campus meeting at a restaurant were he was the only other person present, asked this student to kiss him, invited her to come to his house and also to go out for a drink and asked her what she would do for an "A" and invited another female student to his house to pick up a

---

[23] As discussed in the previous litigation between these parties, WCC policy, pursuant to 34 C.F.R. § 106.8, requires the college to provide a grievance procedure for prompt and equitable resolution of student and employee complaints which allege sexual harassment. *Shub*, 869 F. Supp. at 216.

recommendation, appeared in his bathrobe when she arrived at the appointed time, and put his arm around her and tried to kiss her. Based on this, the arbitrator determined in a 1990 decision that plaintiff engaged in conduct unbecoming an employee. (Poppick Decl., Ex. 5.) In this context, the fact that Hankin sought plaintiff's termination is not enough to establish a retaliatory motive for bringing the disciplinary action and cannot serve as an act of retaliation itself.

The next set of charges occurred five years later, in 1994, and were even further removed from plaintiff's protected union activities. These charges alleged plaintiff: invited a several female students for drinks on different occasions and told one he wanted to see her off campus, asked a female student questions about her personal life and commented on her perfume; invited students sailing on his boat; requested home phone numbers for his students; touched a female student and then raised her grade without justification and gave preferential treatment to female students. (*Id*., Ex. 6.) There is no temporal proximity to establish a causal nexus and no evidence of retaliatory motive. In fact, in the litigation that occurred between the parties in 1994, Judge Brieant stated that "[t]he impartiality of the arbitrator in the 1990 proceedings has not been questioned and removes any taint from the fact that Defendant Hankin has previously charged [plaintiff] with sexual harassment." *Shub*, 869 F. Supp. at 220. Not only is there no evidence Hankin was motivated by retaliation for plaintiff's protected union activities, considering the allegationss against plaintiff it would have been wrong if Hankin had not brought the charges.

But even if there were reason to believe that Hankin engaged in retaliatory conduct against plaintiff in 1989, 1994 and 2000, summary judgment would still be required because there is no evidence that Hankin participated in or influenced the conduct on which the present claims are based. Plaintiff's pure speculation that Hankin "must have" been involved does not create an issue of

material fact to defeat summary judgment. *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation."). There is no evidence of retaliatory motive on the part of Rotando,[24] or Mignogna (and it is far from clear that the latter participated in the decision at issue). In *Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau*, the plaintiffs alleged that in retaliation for their public criticism of the County government, the defendants intentionally interfered with their efforts to renovate a Town building using funds issued to the County and Village defendants by the U.S. Department of Housing and Urban Development. 106 F. Supp. 2d 433, 435 (E.D.N.Y. 2000). The court determined that as to the defendant Hempstead Community Development Agency ("CDA"), there was no inference of a causal connection between the plaintiffs' protected speech and the CDA's action because there was no allegation that the plaintiffs spoke out against the CDA at any time. *Id*. at 438. The court further elaborated that while the plaintiffs might suggest that the CDA was aligned in interest with the County defendants, and thus could be expected to retaliate against the plaintiffs for criticizing the County government, there were no facts that suggested such an inference. *Id*.

Nor is there any evidence that Rotando and Mignogna were aware of Hankin's alleged retaliatory motive and sought to advance it themselves. This fact distinguishes the present case from *Housing Works*. For example, in *Housing Works*, the defendants not only knew about the plaintiffs'

---

[24] Plaintiff claims that Rotando had his own reason to retaliate against plaintiff because during the arbitration of plaintiff's second set of disciplinary charges for sexual harassment in 1994 plaintiff questioned him about inappropriate sales of textbooks. Plaintiff's activity during the arbitration was not a protected First Amendment activity because it was not a matter of public concern. Even if it were protected, the event occurred between 1994 and the 1999 Settlement and is too remote from Rotando's decision in 2006 for there to be a causal nexus. Nor does plaintiff allege that Rotando engaged in a pattern or practice of retaliatory behavior after the arbitration testimony.

protected speech criticizing the Mayor and the City, but they also knew about the Mayor's open and public hostility toward the plaintiffs. 72 F. Supp. 2d at 423.

"The ultimate question of retaliation involves a defendant's motive and intent . . . [and] [w]hile a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss, it is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred." *Gagliardi*, 18 F.3d at 195. There are no facts presented from which we can reasonably infer an intent to retaliate on the part of Rotando or Mignogna. Although plaintiff argues that Rotando knew about the sexual harassment charges and plaintiff's prior litigation with Hankin and WCC because these activities were generally known on the campus, those charges were not retaliatory and Rotando's knowledge (if any) does not in any way support a finding that the February 2006 decision was in retaliation for plaintiff's union activities in the 1970's and 1980's.[25] Plaintiff makes much of the fact that in 1999 Rotando forwarded to Hankin his application to teach because he was aware of the litigation at that time; plaintiff argues that this shows that Rotando must have consulted with Hankin in 2006 as well. However, there is no evidence that Rotando forwarded plaintiff's 2006 request to Hankin or discussed it with him. Rotando readily testified that he forwarded plaintiff's 1999 application because of the litigation at the time, but he denies consulting Hankin in 2006, which is corroborated by the testimony of Hankin and Mignogna, and this evidence is uncontroverted. It was reasonable to consult with Hankin on plaintiff's application in 1999 because it was submitted only a few months after the Settlement was signed. This indicates uncertainty on the part of Rotando about the effects of the legal action on the

---

[25] Plaintiff does not allege that Rotando or Mignogna were even aware of his union activities many years earlier.

hiring process, not First Amendment retaliation. As stated previously, plaintiff's mere speculation that Hankin influenced the 2006 decision not to hire him is not enough to defeat summary judgment.[26]

Plaintiff claims that Mignogna "admitted" that Hankin played a role when Mignogna told plaintiff the determination was made at the "highest level of the administration." (Pl. Mem. Opp. Summ. J. at 17.) However, as discussed above, when examining this statement in the context of plaintiff's entire conversation with Mignogna, in which they discussed the priority list and the background check directive, and considering Mignogna's deposition testimony regarding his

---

[26] Although plaintiff provided evidence that Hankin played a role in the decision not to hire him in 1999 after the Settlement, this does not establish that Hankin played a role in the 2006 decision because the 1999 decision was made shortly after plaintiff entered a settlement with WCC which WCC understood to mean that he would no longer teach there in any capacity. Those circumstances were unique and it is understandable that there would be questions and concerns about hiring plaintiff that could only be answered at the higher administrative levels. Hankin and WCC have established that Hankin does not normally play a role in hiring Adjuncts and did not get involved in the 2006 decision by the Mathematics Department. The fact that he played a role in 1999 during a unique situation involving interpretation of the Settlement agreement is not enough to establish a question of fact about his involvement in 2006.

Although Hankin admits that he saw plaintiff's requests to teach after plaintiff filed the EEOC charges and this lawsuit, he stated that he did not discuss the issue with anyone and had no role in the decision not to hire plaintiff at that time either. Plaintiff tries to prove otherwise by claiming that Hankin's statement in his declaration is an admission of his involvement. (Pl. Mem. Opp. Summ. J. at 12.) Hankin stated: "I had absolutely nothing to do with the Math Department's hiring decision concerning Peter Mucci, rather than [plaintiff]; and I have not had anything to do with the Mathematics Department's subsequent decisions about hiring Adjuncts other than [plaintiff]." (Hankin Decl. ¶ 7.) Plaintiff argues that the language "other than [plaintiff]" is a concession that Hankin had something to do with the decision not to hire him. However in considering all the evidence before us we do not think the statement can be interpreted the way plaintiff argues. In the very same Declaration, Hankin states: "I was never consulted about whom to hire or not to hire as a part-time Adjunct teacher in the Mathematics Department when [plaintiff] was seeking a position in 2006, and I had nothing to do with the decision." (*Id.* 3.) Considering this statement with the testimony Hankin gave at his deposition to the same effect, and the testimony of Rotando and Mignogna, and the absence of any evidence to the contrary, no reasonable jury could find that Hankin participated in the 2006 hiring decision.

statement, Mignogna was not referring to Hankin nor was he referring to the actual decision not to hire plaintiff. He was referring to the fact that plaintiff was no longer on the priority list as Mignogna discussed with his superior, Glusker. Plaintiff's attempt to attribute a different meaning is an objectively unreasonable interpretation.[27] "[A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce some tangible proof to demonstrate that [his] version of what occurred was not imaginary." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (internal quotation marks and citation omitted).

Plaintiff argues that defendants departed from the normal procedures for hiring Adjuncts in two ways when they considered his application in February 2006. "[A] plaintiff can also show retaliatory intent by establishing unequal treatment. . . ." *County of Nassau*, 106 F. Supp. 2d at 437; *see Hurdle v. Bd. of Educ.*, 2002 WL 31834454, at *4 (S.D.N.Y. Dec. 16, 2002). Plaintiff claims that Rotando's usual practice did not involve consultation with anyone higher in the chain of command when making a decision about hiring an Adjunct, and the only exception was when plaintiff applied in the Spring 2006 semester. (Pl. Mem. Opp. Summ. J. at 17.) Additionally, plaintiff states that defendants violated the CBA by hiring Mucci because the two additional statistics sections he was hired to teach caused Mucci to exceed the 20-credit limit written in the CBA. (*Id.*)

---

[27] Plaintiff argues that because Rotando and Mignogna admitted that they thought plaintiff was no longer on the priority list before consulting people higher up the chain of command, then the purpose for them consulting people higher up could not have been to clarify whether plaintiff had priority and must have been for another reason. (Pl. R. 56.1 Stmt. ¶ 42.) However, Rotando and Mignogna testified that their purpose for consulting people higher up was to clarify the priority issue, and plaintiff offers no evidence to controvert this testimony. Additionally, it was reasonable for Rotando and Mignogna to confirm their interpretation of the contract with people higher up. There is no evidence that the person Mignogna spoke with was Hankin. Indeed Hankin and Mignogna deny this although Mignogna and Glusker admit that they discussed the issue with each other and with Wittenberg.

As defendants point out, "Rotando can hardly be faulted for first checking whether he was contractually obligated under the priority requirements of the CBA to hire [plaintiff] versus Mucci." (Def. Reply Mem. Supp. Summ. J. at 9.) To the extent that their conversation concerned contractual obligations and county policies (the background check), these are legitimate considerations when hiring an employee. Although Mignogna and Rotando believed that plaintiff was no longer on the priority list, they can not be faulted for confirming this opinion with people higher in administration. And although Rotando and Mignogna admit that ordinarily Mignogna was not consulted when Rotando made the decision to hire an Adjunct, there were other occasions in which Mignogna was consulted, not just when plaintiff was hired in the spring of 2006. (Berg Aff., Ex. 1 at 33 & Ex. 2 at 14.) Additionally, the union and WCC have an agreement that the credit limit does not apply when a position is being filled on a short-notice basis due to a professor leaving mid-semester, as was the case here. (Mignogna Decl. ¶ 9; Poppick Reply Decl., Ex. 23 at 90-91.) Plaintiff has not created an issue of fact or an inference that he was not treated equally during the Adjunct hiring process.

**4.      Defendants Would Have Made the Same Decision Regardless of Plaintiff's First Amendment Activities**

There is no evidence in the record of the causal nexus necessary to establish a First Amendment claim. However, even assuming there were, defendants have demonstrated that they would have hired Mucci over plaintiff regardless of plaintiff's protected union activities. Once a plaintiff satisfies the three elements necessary to establish a First Amendment claim, the defendant may avoid liability if it can "demonstrate by a preponderance of the evidence that it would have

taken the same adverse action regardless of the protected speech." *Cobb*, 363 F.3d at 102; *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Rotando has offered legitimate reasons as to why he preferred Mucci to plaintiff that have nothing to do with plaintiff's history of protected First Amendment activities, and plaintiff has not offered any evidence that could rebut that showing. Rotando explains that he thought Mucci was a better choice because of his qualifications, and given that plaintiff was not on the priority list the college was not obligated to hire him. Plaintiff argues that he received from Simpson, Rotando and Mignogna many different and inconsistent reasons as to why he was not chosen, and that this implies a retaliatory motive. We disagree with this analysis. Simpson, Rotando and Mignogna all told plaintiff in one way or another that he was not on the priority list. The fact that Rotando did not offer plaintiff further explanation does not support an inference of retaliation.

Even if Mignogna influenced Rotando's decision, he too believed that plaintiff was not on the priority list and the background check would impede his ability to start immediately, which was necessary. Plaintiff argues that the fact that Mignogna incorrectly thought Mucci had a mathematics degree when he spoke with plaintiff shows that Mignogna did not review Mucci's resume before the decision was made to hire Mucci. (Pl. R. 56.1 Stmt. ¶ 25.) But whether or not Mignogna reviewed Mucci's resume is irrelevant because he did not make the decision that Mucci was qualified for the position; Rotando did. There is no dispute that Rotando knew about Mucci's qualifications and once he got confirmation that he was not obligated to hire plaintiff because plaintiff was no longer on the priority list, he decided to hire Mucci.[28]

---

[28] Plaintiff argues that Rotando could not possibly have reviewed Mucci's resume and transcripts prior to February 2006 because those documents are dated after February 2006. (Pl. R. 56.1 Stmt. ¶ 25.) However, plaintiff refers to a later version of these documents. There were earlier

Although plaintiff has more years teaching statistics at the college level, and may be more qualified than Mucci in that regard, it is not for this court to second guess the non-retaliatory reasons of Rotando in hiring Mucci. While discriminatory or retaliatory employment practices are prohibited, a court must "'respect the employer's unfettered discretion to choose among qualified candidates.'" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (quoting *Fishbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). Rotando knows better than this Court what qualifications are necessary and which candidate will best serve the goals and policies of the Department. Even though Mucci may have been less experienced, on the record before us we do not question that he was qualified to teach the position and indeed had already been chosen to teach one section of that course earlier that semester. The fact that plaintiff may be more qualified does not mean that Rotando or Mignogna must have had retaliatory motives when choosing Mucci over him.[29] *See Morris*, 196 F.3d at 113-14 (determining that plaintiff did not offer evidence

---

versions that McQuade testified she had in her files and gave to Rotando in the Fall 2005. (Poppick Reply Decl. ¶ 12; Poppick Decl., Ex. 13.)

Plaintiff also argues that Mucci could not recall submitting a resume, transcript or cover letter with his July 2005 application but did recall submitting paperwork later in the Fall. (Pl. R. 56.1 Stmt. ¶ 29.) However, what Mucci said at his deposition when asked if he specifically recalled submitting the documents in July 2005 was "I don't know if I can say 100 percent, but I believe that I did." (Berg Aff., Ex. 27 at 22-23.) The uncontroverted evidence is that Rotando indeed saw the documents and reviewed Mucci's qualifications before hiring plaintiff in February 2006.

Finally plaintiff claims inconsistencies in Rotando's and McQuade's recollections of their conversation in the Fall of 2005 regarding Mucci and his qualifications to teach statistics. (Pl. R. 56.1 Stmt. ¶ 30.) However, even if there are inconsistencies in their recollection of the specifics of that conversation, there is no doubt that they did discuss Mucci and that he was in fact assigned to teach a section of the statistics course for the Spring 2006 semester before there was an emergency need for someone to take over the other two sections. Therefore, the exact conversation is irrelevant; they found Mucci qualified to teach the course before he and plaintiff applied for the emergency Adjunct position; that decision had nothing to do with a comparison to plaintiff.

[29] Plaintiff may have taken more math courses than Mucci, however, Mucci took numerous engineering courses for both his degrees in mechanical engineering which had mathematical content

of retaliatory causation to survive summary judgment because defendants proffered, as their reason for terminating plaintiff, that he could no longer fully perform his duties because of an injury). Plaintiff's disagreement with Rotando's assessment of his and Mucci's qualifications does not create an issue of material fact.  *See Jimoh v. Ernst & Young*, 908 F. Supp. 220, 226 (S.D.N.Y.1995) ("As a matter of law, an employee's disagreement with an employer's business decision is insufficient to prove discriminatory conduct.").

A plaintiff can use a discrepancy between his qualifications and those of the person promoted to defeat summary judgment only if "the plaintiff's credentials . . . [were] so superior . . . that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Byrnie*, 243 F.3d at 103 (quoting *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999)).  It is not beyond reason that Rotando felt Mucci was a better candidate at the time, given that he had cleared the background check, had an impressive resume and was already teaching a section of that statistics course. Plaintiff has not provided evidence that the proffered reasons were pretextual.

Because plaintiff has not established a prima facie case of First Amendment retaliation or a triable issue as to whether defendants' legitimate business reason for hiring Mucci was a pretext, defendants' motion for summary judgment is granted as to the First Amendment retaliation claim.

### III.   Plaintiff's Age Discrimination Claim

"The ADEA makes it unlawful for an employer 'to fail or refuse to hire . . . any individual

---

as well.  It is precisely for these reasons that the court can not play super employer and assign an exact weight to the various credentials of plaintiff and Mucci; that is for the employer to do.

. . . because of such individual's age.' The protections of the ADEA reach individuals who are at least 40 years old." *Id.* at 101 (quoting 29 U.S.C. §§ 623(a)(1) & 631(a)) (alterations in original). A prima facie case under the ADEA consists of four elements: (1) plaintiff was within the protected group, (2) plaintiff applied for a position for which he was qualified, (3) plaintiff was subject to an adverse employment action and (4) that adverse employment action was made under circumstances giving rise to an inference of unlawful discrimination. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The burden upon the plaintiff to prove a prima facie case is minimal, and once that case has been established the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision to rebut the presumption of discrimination. *Id.* at 101-02. "If the employer offers, via admissible evidence, a justification of its action which, if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination, then 'the *McDonnell Douglas* framework-with its presumptions and burdens-disappear[s], and the sole remaining issue [is] discrimination *vel non*.'" *Id.* at 102 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)) (alterations in original).

A. **Prima Facie Case**

Plaintiff has made out a prima facie case of age discrimination. At age sixty-two, he is within the protected class. He was also qualified to teach statistics as an Adjunct, and defendants do not argue otherwise. He was not hired, and the fact that the person assigned to teach the class was twenty-five years younger raises an inference of discrimination. *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (holding that the replacement of a sixty-year-old employee by a thirty-one-year-old employee satisfied the fourth element of a prima facie case); *Tarshis v. Riese Org.*, 211

F.3d 30, 38 (2d Cir. 2000) (finding that the replacement of the plaintiff by someone eight years younger raised an inference of age discrimination), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002); *Golia v. Leslie Fay Co., Inc.*, 2003 WL 21878788, at *3-4 (S.D.N.Y. Aug. 7, 2003) (holding plaintiffs established fourth element where defendant hired several employees between thirteen and twenty years younger than plaintiffs around the same time it fired plaintiffs).

### B. Defendants' Legitimate Business Reason

As already discussed, defendants have offered legitimate reasons for hiring Mucci over plaintiff. Rotando, who made hiring and promotion decisions for the Mathematics Department for twenty-six years, stated that he hired Mucci because he was already teaching a section of the same statistics course, graduated *summa cum laude*, received an "A" in a graduate statistics course, taught undergraduate engineering courses with mathematical content, had training in statistics at GE and received a favorable recommendation from McQuade. (Def. R. 56.1 Stmt. ¶ 46; Rotando Decl. ¶¶ 3, 5, 8; Def. Reply Mem. Supp. Summ. J. at 12.) Additionally, although Mucci did not have a mathematics degree, his undergraduate and graduate course-work included courses in mathematics and applied mathematics. (Poppick Reply Decl., Ex. 22 at 166.)

By offering evidence of Mucci's qualifications for the position, defendants have stated a legitimate business reason for granting him the position instead of plaintiff. *See Byrnie*, 243 F.3d at 102. The burden therefore shifts back to plaintiff to prove that this reason is a pretext for age discrimination. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

### C. Plaintiff's Argument That Defendants' Reason is Pretextual

An employment discrimination plaintiff can defeat summary judgment if his "'prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *Byrnie*, 243 F.3d at 102 (quoting *Reeves*, 530 U.S. at 148). But plaintiff is not required to prove that defendants' justification was false or played no role in the employment decision. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). He need only show that the "legitimate" reason was not the only one behind defendants' decision, and that age was a motivating factor. *See id.*; *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 81 (2d Cir. 2001) ("[P]laintiff may . . . rely on evidence – circumstantial or otherwise – showing that 'an impermissible reason was "a motivating factor," without proving that the employer's proffered explanation' played no role in its conduct.") (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997)).

Plaintiff offers three reasons why defendants' legitimate business reason is pretextual: (1) the evidence refutes defendants' proferred reason and casts doubt upon defendants' credibility; (2) there is evidence from which a reasonable jury could conclude that age was at least a motivating factor in the employment decision at issue and (3) the facts defendants assert in support of their legitimate business reason are significantly disputed. (Pl. Mem. Opp. Summ. J. at 29.) We have already addressed reasons one and three in the discussion of plaintiff's First Amendment retaliation claim. For the same reasons they did not establish any evidence or inference of pretext for retaliation, they do not establish any evidence of pretext for age discrimination, and therefore do not establish a question of material fact. The only issue left to address is plaintiff's evidence that age

was a motivating factor in the decision at issue.

Plaintiff argues that there is an inference that age was at least a motivating factor because two other retirees (Professors Krikorian and Morrison), one in his sixties and one who may have been as old as seventy, were also not hired by WCC. (*Id.*; Pl. R. 56.1 Stmt. ¶¶ 167-68.) Plaintiff argues that defendants' reason for not hiring these retirees as Adjuncts, that they were no longer on the priority list, was pretextual. (Pl. Mem. Opp. Summ. J. at 29.) Plaintiff supports this argument with an email sent by Mignogna on March 21, 2006 with respect to the retirees, that said "we've made it a point of getting them off the list." (Pl. R. 56.1 Stmt. ¶ 170; Berg Aff., Ex. 25.)

The email exchange plaintiff submits started as a request from Barbara Wilson ("Wilson") on behalf of Hankin, in which she inquired of Mignogna whether there were other instances, in addition to the one involving plaintiff, where a professor was removed from the priority list after not teaching for three semesters. (Berg Aff., Ex. 25.) Mignogna responds that Krikorian and Morrison were "the only ones where we've made it a point of getting them off the list. Others have simply told us they're no longer interested, so they don't count." (*Id.*) When Wilson asked for further clarification, Mignogna responded:

> In the case of Krikorian, we did remove him. He refused us for three semesters, and then, when he wanted a course, we told him he was no longer on the list. . . . Anne D'Orazio was the newly installed president of [the union], and she agreed with us. As to Morrison, we've not heard from him, and no longer ask him if he's interested.

(*Id.*)

As a preliminary matter, the fact that plaintiff and two other professors in the protected age group were removed from the priority list is not statistical evidence of discrimination. Courts routinely reject statistical evidence of discrimination based on such small sample sizes because the

results are not probative.  *See, e.g.*, *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 121 (2d Cir. 1997) ("The smaller the sample, the greater the likelihood that an observed pattern is attributable to [non-discriminatory] factors and accordingly the less persuasive the inference of discrimination to be drawn from it.");  *Alleyne v. Four Seasons Hotel - N.Y.*, 2001 WL 135770, at *12 (S.D.N.Y. Feb. 15, 2001) (citing cases).

Next, examining plaintiff's evidence and the record as a whole, there is no inference that age was a motivating factor in the decision at issue, or in the decisions regarding Krikorian and Morrison.  Plaintiff offers no evidence that his age was a factor in Rotando's decision in February 2006.  He also offers no evidence that Professors Krikorian or Morrison were not hired because of their age, other than the fact that at the time they were removed from the priority list they were in a protected age group.  There is no evidence that younger professors were hired instead of these professors.  Nor is there any implication in Mignogna's email that the reason they were removed from the priority list was because of their age, the email exchange clearly states a legitimate reason: they had not taught for three semesters.  This was even checked with the union President at the time.

Plaintiffs' conclusory allegation that age must have been a motivating factor because two other retired professors in the protected age group were removed from the priority list is unsupported by any actual evidence of discriminatory motive.  It is therefore insufficient to defeat summary judgment.  *See, e.g., Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985.)

In deciding a defendant's summary judgment motion when the plaintiff has offered multiple forms of evidence, a court must always keep in mind the entire record before it:

> [T]he court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination and whether the

defendant's proffered explanation is a pretext for such discrimination, would be entitled to view the evidence as a whole.

*Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000). In this case, plaintiff has made a number of allegations in his attempt to rebut defendants' justification for not hiring him. "Each one is simply too vague, conclusory, unsupported or otherwise legally insufficient to do so. Taken as a whole, they come no closer to rasing a genuine issue of material fact regarding defendants' justification for their decision." *Witkowich v. Gonzales*, 2008 WL 701280, at *13 (S.D.N.Y. Feb. 25, 2008) (Conner, J.). Plaintiff can not show that his qualifications were so superior to Mucci's that no reasonable person would have hired the latter over the former, which means he must offer some other evidence of discrimination to survive summary judgment. *See Byrnie*, 243 F.3d at 103. But plaintiff's other evidence of discrimination – the fact that two other professors in the protected age group were removed from the priority list – is simply incapable of supporting the interpretation plaintiff attaches to it and he has offered absolutely no evidence those decisions were motivated by bias.

Because plaintiff has not offered evidence that defendants' legitimate business reason for hiring Mucci rather than him was a pretext, defendants' motion for summary judgment is granted as to the age discrimination claim.


## IV.    Plaintiff's Retaliation Claim

Plaintiff also claims that defendants have retaliated against him by not hiring him despite his requests for an Adjunct position since he filed a Charge of Discrimination with the EEOC on June

2, 2006.  (Complt. ¶ 24; Pl. Mem. Opp. Summ. J. at 31.)[30]

Defendants argue that plaintiff can not bring an action in this court alleging retaliation under the ADEA for the decision not to hire him for the Fall 2006 and subsequent semesters because plaintiff did not file EEOC charges for those actions.  ADEA claims must be brought before the EEOC as a precondition to bringing them in federal court.  *See Idrees v. City of N.Y. Dep't of Parks & Recreation*, 2005 WL 1026027, at *7 (S.D.N.Y. May 3, 2005).  Defendants argue that because plaintiff did not file separate EEOC charges within 300 days of each of defendants' decisions not to hire him for the Fall 2006, Spring 2007 and Summer 2007 semesters, he has lost the right to recover for those acts.  (Def. Mem. Supp. Summ. J. at 16.)  Defendants cite *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) for support.  *Morgan* is inapposite, however, because the Court held that acts of discrimination preceding an EEOC filing were discrete acts that would be time barred if an EEOC charge was not filed in a timely manner as to those preceding acts.  536 U.S. at 113.  However, the law regarding acts of discrimination subsequent to an EEOC filing is different.  In that instance, a plaintiff need not file a separate EEOC charge for subsequent acts of discrimination in order for a court to have jurisdiction over those claims.  Jurisdiction exists if the claims are "based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge."  *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (internal quotation marks and citation omitted); *see Idrees*, 2005 WL 1026027, at *7.

---

[30]  Our granting summary judgment against plaintiff on his underlying age discrimination claim does not preclude him from maintaining a retaliation claim.  *See McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001) (noting that the employer's conduct of which plaintiff complained need not actually have been a Title VII violation for plaintiff to state a prima facie case of retaliation); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988); *Avillan v. Potter*, 2006 U.S. Dist. LEXIS 80062, at *53 (S.D.N.Y. Nov. 1, 2006).

> Subsequent conduct is reasonably related to conduct in an EEOC charge if: (1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."

*Alfano*, 294 F.3d at 381 (quoting *Butts v. City of N.Y. Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1402-03 (2d Cir.1993)). Plaintiff alleges that the decision not to hire him for the Fall 2006 and subsequent semesters was in retaliation for filing the EEOC charge in June 2006, therefore defendants' subsequent conduct is reasonably related to conduct in his EEOC charge and this Court has jurisdiction over those claims.

A prima facie case of retaliation under the ADEA requires a showing that:

> (1) the plaintiff was engaged in an activity protected under the ADEA; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the protected activity and the adverse action taken.

*Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997). Plaintiff alleges that Rotando and Mignogna were aware of his protected EEOC activity and that in response thereto they retaliated against him by not considering his applications to teach as an Adjunct for the Fall 2006 and subsequent semesters. (Pl. Mem. Opp. Summ. J. at 31.) He has therefore established the first three elements necessary for a prima facie case of retaliation under the ADEA. We consider whether plaintiff has established a nexus between his filing the Charge of Discrimination and defendants' decision not to hire him for the Fall 2006 and subsequent semesters. "'Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003) (quoting *Morris*, 196 F.3d

at 110). Plaintiff offers both direct evidence of retaliatory motive and circumstantial evidence.

Plaintiff claims defendants admitted that the decision not to hire him for the Fall 2006 and subsequent semesters was in retaliation for the EEOC charges. (Pl. Mem. Opp. Summ. J. at 31.) As evidence he offers the testimony of both Rotando and Mignogna. At Rotando's deposition, when asked why he decided not to hire plaintiff after the Spring 2006 semester, Rotando replied: "Well, we had a suit pending against us and I just didn't know how to proceed after that." (Berg Aff., Ex. 1 at 116.) When asked if there was any other reason, he replied: "Not that I recall." (*Id*.) Mignogna testified that Simpson showed him letters from plaintiff requesting an Adjunct position for the Fall 2006 and subsequent semesters. (*Id*., Ex. 2 at 130.) When asked what he said to Simpson regarding the requests, Mignogna replied: "Other than to say to him we got all kinds of ongoing things. Don't respond to this. And I'm paraphrasing. But don't respond." (*Id*. at 131.) When asked what he meant by "all kinds of ongoing things," Mignogna replied: "I knew there was a grievance. I was not sure what the status of it was. I knew there was at least one lawsuit, and I did not know the status. The matter that we're talking about here, and I knew it was ongoing." (*Id*. at 131-32.)

Defendants argue that Rotando did not testify that he intentionally declined to hire plaintiff because of the legal proceedings; he testified that after plaintiff filed the charges he did not know how to proceed. (Def. Reply Mem. Supp. Summ. J. at 10.) A reasonable interpretation of Rotando's statement could be that one reason behind the decision not to hire plaintiff for the Fall 2006 semester was because he filed the EEOC charge.[31] Although a plaintiff may not rely on conclusory assertions

_____

[31] Defendants also make a similar argument about Mignogna's testimony, contending that Mignogna did not state that the grievance was the reason for denying plaintiff a position. (Def. Reply Mem. Supp. Summ. J. at 10.) However, a reasonable jury could conclude that Mignogna's statement supplies an inference that the decision not to hire plaintiff for the Fall 2006 and subsequent semesters was because of the EEOC charges. Additionally, as defendants fervently argued above,

of retaliatory motive, "but must offer instead some tangible proof to demonstrate that [his] version of what occurred was not imaginary," plaintiff has offered "some tangible proof" to demonstrate that one reason defendants did not hire him was because he filed the EEOC charge. *Morris*, 196 F.3d at 111. That is enough to establish a prima facie case. *See Mandell*, 316 F.3d at 383 (determining that plaintiff adduced sufficient direct evidence of retaliatory animus to create a triable question of fact on causation where plaintiff introduced evidence of negative comments and recommendations in his personnel file referencing plaintiff's protected speech).

Plaintiff also claims that the close proximity of the time when he filed the charge in June 2006 and the time when he was not hired to teach for the Fall 2006 semester is circumstantial evidence of a retaliatory motive. (Pl. Mem. Opp. Summ. J. at 31.) We discussed previously the close temporal proximity necessary to establish a causal nexus. In this Circuit, even a time frame of three months between the protected activity and the adverse action can be too long to establish a causal nexus when there is no other evidence that tends to show a retaliatory motive. *See Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir. 1990). Here, however, Rotando and Mignogna's statements, taken together with the close proximity of time of plaintiff's filing the charge and that of the decision not to hire him (at most the time between filing the charge in June and the beginning of the Fall semester is three months), is sufficient to create a triable issue of fact on this issue. *See Suggs v. Port Auth. of N.Y. & N.J.*, 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (determining that adverse action taken six months after plaintiff filed his EEOC charge, together with evidence that defendant was angry at plaintiff and had previously wanted him fired, established an inference of causal nexus).

---

Mignogna was not the decision maker, Rotando was.

Under the ADEA, "once a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). In the record, the only legitimate reason defendants offer is Rotando's statement that: "We made the hiring decisions for the Fall 2006 Semester in late August 2006. Bienenfeld returned to teach his statistics courses as of the Fall 2006 semester. We have had qualified Adjuncts to fill all teaching spots since then, and we have not had the need to hire [plaintiff]." (Rotando Decl. ¶ 7.) Because plaintiff need not prove that defendants' legitimate explanation played no role in the decision but need only show that it was not the only reason, and because the evidence discussed above creates a material issue of fact as to whether plaintiff's EEOC charge was a motivating factor in defendants' decision, summary judgment is inappropriate. *See Holtz*, 258 F.3d at 81; *Cronin*, 46 F.3d at 203. Therefore, defendants' motion for summary judgment as to the ADEA retaliation claim is denied.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiff's First Amendment retaliation claim and plaintiff's age discrimination claim and denied as to plaintiff's ADEA retaliation claim.

SO ORDERED.

Dated: White Plains, New York
      April 7, 2008

*William C. Conner*
————————————————
Sr. United States District Judge

48